### Twin Valley Motors, Inc. v. John Morale, et al.

[385 A.2d 678]

No. 133-77

Present: **Barney, C.J., Daley, Larrow, Billings and Hill, JJ.**

Opinion Filed April 4, 1978

116

*George E. Rice, Jr.,* Montpelier, for Plaintiff.

*Harry A. Black* of *Black & Plante,* White River Junction, for Defendant.

**Barney, C.J.** In 1971 the Pelletiers bought a new car. Although at the time they did not have sufficient funds, they were expecting a personal injury settlement on account of an automobile accident in which they were involved. John Morale, Esquire, the defendant, was their lawyer. Twin Valley Motors, Inc., plaintiff here, was the seller.

In order to close the deal the Pelletiers signed a letter prepared by the seller instructing the defendant to assign to the seller the sum of $4,132.25 out of the proceeds of the accident settlement when received, to pay for the new car. A sales agreement was executed between the seller and the Pelletiers calling for the payment of the $4,132.25 by October, 1971.

This sales agreement was assigned by the seller with recourse to the General Motors Acceptance Corporation.

For some reason, in September, 1971, the Pelletiers and G.M.A.C. refinanced the sales agreement and negotiated a contract payable in 36 installments. The total to be paid increased from $4,132.25 to $5,238.17. The seller was aware of the refinancing agreement and made no objection to G.M.A.C., who still had recourse against it. According to the findings there were benefits accruing to the seller which it accepted. Mr. Pelletier made the required payments under the refinanced contract up to August 10, 1972.

At about that time the new car was damaged in an accident and brought back to the seller for repairs. A dispute arose over the repair bill which triggered two events. The Pelletiers refused to make further payments, and the seller claimed the car under a mechanic's lien.

Before all this difficulty arose, the insurance proceeds became available, in February of 1972. At the direction of his clients the defendant paid the medical and hospital bills and prepared a check in the amount of $4,132.25. His clients requested that this check be drawn to the order of them or Twin Valley Motors, Inc., in order that the Pelletiers could negotiate their obligation with the seller. The check was so drawn. The Pelletiers were thus able to cash it without the seller. This they did.

In April of 1972 the defendant wrote advising the seller that he considered it bound by the refinancing agreement. In the same month he also advised the seller that it would have to deal directly with the Pelletiers, and that the defendant did not accept any assignment of funds due his clients at that time contract payments were being made.

In September the problems previously noted arose, and the car was repossessed by G.M.A.C. two days prior to the expiration of the ten days the Pelletiers had to pay the installment due. The trial court found that the repossession procedures did not comply with the law and that therefore the Pelletiers and Morale cannot be charged with any deficiencies. G.M.A.C. did look to the plaintiff seller under its assignment, and the seller sought to enforce its loss against the $4,132.25 it claimed the defendant was required to assign to them.

There is no doubt but what his clients, in 1971, gave the defendant authority to transfer funds to the seller when certain money was received by him. Neither is there any question but that in February, 1972, that direction was replaced by a new command from his clients to pay the amount in controversy over to them in the form of the check previously noted. This change in instructions took place at the time the settlement funds were first received by the defendant, and at a time when the clients were not indebted to the seller.

The plaintiff argues that the arrangement was a binding assignment that could not be countermanded by the Pelletiers. The essential ingredients for that to occur include an existing debt owing to the Pelletiers, agreement by the debtor to pay according to the assignment, and an authorization so complete as to amount to a transfer of the obligation to the assignee and the intentional establishment of an irrevocable right to the assigned fund.

The arrangement as found by the trial court, supported by the facts and the law, does not fulfill, in several particulars, the necessary characteristics. These essentials have basic ingredients that have parallels in the standards for gifts and other transfers of ownership.

Thus a principal concern is control. A valid assignment is more than a promise to apply particular funds to the payment of a debt. The inquiry is whether, based on the claimed assignment, the assignee has had delivered up to him full control of the fund beyond the reach of any contrary directions of the assignor. 6A C.J.S. *Assignments* § 53c, at 674–75.

Even assuming the defendant was sufficiently a debtor with respect to the Pelletiers, the authority conferred upon him to transfer money at some later time when the claimed debtor relation would arise is not enough under the law, being merely executory. The claim of assignment is further compromised by its obvious security nature. This is a characteristic inconsistent with the transfer of ownership ingredient essential to make an irrevocable assignment. *Whit-*

*tle* v. *Skinner*, 23 Vt. 531, 535 (1851) ; 6A C.J.S. *Assignments* § 82, at 732.

The trial court quite rightly viewed the defendant's responsibility to the direction of his clients an unbroken one persisting beyond their execution of an instrument evidencing only an executory agreement to pay out of a particular fund. 6 Am. Jur. 2d *Assignments* § 83, at 265–66. The defendant was bound to honor their amendment of any previous directions to him with respect to disposition of the proceeds.

This view of the matter makes it unnecessary to consider the effect of other facts which may also operate to compromise the claim against the defendant, such as the several contract renegotiations, the effect of the assignment to G.M.A.C. and its status as a principal contracting party, to say nothing of the effect of the irregularities found in the repossession proceedings. The order of the trial court dismissing the Pelletiers' counterclaim and also denying recovery against them by the plaintiff has not been challenged on appeal and, being fully supported, is therefore also affirmed.

*Judgment affirmed.*